# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 13, 2000

## STATE OF TENNESSEE v. JAMES M. LOVEDAY

**Direct Appeal from the Circuit Court for Sevier County**
**No. 7468     Richard R. Vance, Judge**

---

**No. E1999-02072-CCA-R3-CD**
**February 8, 2001**

---

Following a jury trial, Defendant, James M. Loveday, was convicted of one count of attempted first degree murder, four counts of aggravated assault, and two counts of reckless endangerment. The trial court sentenced him to twenty-five (25) years for the attempted first degree murder conviction, six (6) years for each of the four aggravated assault convictions, and two (2) years for each of the reckless endangerment convictions. The sentences were ordered to be served consecutively to each other for a total sentence of fifty-three (53) years. On appeal, he challenges the sufficiency of the evidence to sustain the convictions of attempted first degree murder and aggravated assault, and argues that the trial court erroneously admitted testimony of prior bad acts, improperly considered victim impact letters in the presentence report, and argues that the sentences are excessive and that the trial court erred by ordering consecutive sentencing. After a review of the record, we affirm the judgment of the trial court as modified herein.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Sevier County Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID G. HAYES, J., joined.

James W. Greenlee, Sevierville, Tennessee, for the appellant, James M. Loveday.

Paul G. Summers, Attorney General and Reporter; R. Stephen Jobe, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

## I. FACTS

At the time of the trial, the Defendant and his wife, Karen Loveday, had been married twelve years but had been separated approximately two years. They had three children, Jimmy Loveday, Flora Loveday, and Angel Loveday. Karen testified that during the marriage, Defendant had been abusive to her and the children and had pulled a gun on her at least three times. She finally decided to leave the Defendant. The Defendant had told her that if she took the children, she would not get away and there would be "hell to pay" wherever he might catch her. Subsequently, Karen was informed that the Defendant had filed for custody of the children in a Sevier County court. Having previously left the area, Karen returned to Sevier County to participate in the custody hearing. She prevailed and was awarded temporary custody of the children. Furthermore, Defendant was ordered not to have contact with the children pending a report from a court-appointed guardian ad litem. Not long before the shooting incident involved in this appeal, Karen again returned to Sevier County so that the guardian ad litem could interview the children. She and the children were staying at the home of friends, Thomas and Edith Merritt.

On August 7, 1998, Karen took the children to be interviewed by the guardian ad litem. Later that evening, Karen returned with her children to the Merritt house. Also present was Mrs. Merritt's son, J.C. Ramsey, and Robert Byrd. Two additional children, Matt and Tony Scott, were present. Mrs. Merritt was babysitting the Scott children.

Having been informed that his wife and children were at the Merritt home, Defendant called the home and asked to speak to his son, Jimmy Loveday. J.C. Ramsey testified that he answered the Defendant's telephone call at approximately 6:21 p.m. J.C. advised his mother that the Defendant was on the phone. She took the phone and listened for a minute and then hung up on the Defendant. J.C. left the house and was not present at the time of the shooting incident. After Karen became aware that the Defendant had called, she became frightened and wanted to have her children taken to another location. Thomas Merritt took Karen and Defendant's daughters to another house. Thomas Merritt took Jimmy Loveday out for a ride, but then they both later returned.

At approximately 10:30 p.m., Karen Loveday, her son, Jimmy Loveday, Thomas and Edith Merritt, Robert Byrd, and the two Scott children were inside the Merritt home. Suddenly, they all noticed that bullets began to be fired into the home. Thomas Merritt was struck by one bullet while standing in his bedroom. Proof showed that the bedroom window was on the front side of the house, and the windows in the house were all open, lights were on inside the entire house, and the front door was open. Karen Loveday ran though the house to the phone to call 911. There was testimony that it appeared as though bullets were striking objects directly behind her as she ran through the house. Thomas Merritt received his injury in the left side of his back. He had to be taken by Lifestar helicopter to a hospital in Knoxville. He had injuries to his bladder, kidneys, and heart. He remained in an intensive care unit for at least one month and then underwent therapy at another hospital for at least an additional month.

The witnesses inside the home heard a vehicle racing its engine just after the shots stopped, and saw the car lights as the vehicle drove away at a fast pace.

In August, 1998, Defendant was staying with Mike Maples at his home in Sevierville. The Maples residence was approximately five or six miles away from the Merritt residence. Earlier in the late afternoon or early evening of August 7, 1998, Maples and his girlfriend were swimming with the Defendant and two young women. After swimming, Maples and his girlfriend went home and the Defendant and the two other women went elsewhere. Later, the Defendant and the young women arrived at Maples' residence before dark. Maples had several people at his house for a social gathering.

At some point after dark, Maples realized that the Defendant had left. Later on that night, Maples was advised that the Defendant was outside and wanted to speak to him. The Defendant was standing in front of his grey Dodge vehicle. The Defendant gave Maples a .380 caliber semi-automatic pistol and the carrying case in which it was placed. Defendant requested Maples to put the gun up. Defendant then sat on Maples' couch and everyone else went to bed.

At approximately 5:00 a.m. the same night, Maples answered a knock at his door. Deputy Sheriff John Brown was at Maples' door and asked if the Defendant was present. He stated that Defendant was still sitting on the couch. Deputy Brown asked Maples about a gun and he told Deputy Brown where the gun could be found. This was the same weapon that Defendant had given Maples earlier that night. Maples testified that during the time periods he spoke with the Defendant, he did not seem to be intoxicated or acting out of the ordinary.

Karen Loveday had previously informed Deputy Brown that the Defendant was probably the one who had fired the shots and gave him a description of his vehicle. The information received by Deputy Brown led him to the Maples' residence to look for the Defendant.

Edith Merritt testified regarding two incidents when Defendant made threatening statements concerning Karen Loveday and others. On one occasion, the Defendant advised her that she might have to raise the couple's children "if [Defendant] done away with himself and Karen." On another occasion, the Defendant asked Edith Merritt if she had yet received a subpoena to testify in the couple's divorce proceedings. She advised that she had not yet received the subpoena. Defendant told Mrs. Merritt that she would get a subpoena and that "ever who's going to be on her [Karen Loveday] sides [sic] going to be sorry."

Deputy Brown testified that he found two spent bullets inside the house, one behind the television and one behind a door in the living room. He added that not all of the bullets fired into the house were found. He found at least six bullet holes in different parts of the Merritt home. He further testified that the Merritt home is approximately 35 to 40 feet away from the road and that visibility inside the house from the road was very clear if the windows were open and the lights were turned on. Based upon his investigation at the scene and speaking with the victims, Deputy Brown began to look for the Defendant. After receiving information from one of the Defendant's

acquaintances, he went to Maples' home at approximately 5:00 a.m. He received the .380 caliber pistol that Defendant had given to Mike Maples. He also found inside the gun case, one empty clip for the pistol and one clip containing four live cartridges. No clip was in the gun at the time he received it. He testified that the clip would hold six or seven bullets.

Deputy Brown stated during the trial that the Defendant signed a consent to search the Defendant's vehicle. There were two spent shell casings from a .380 caliber bullet on the driver's side of the Defendant's vehicle. The pistol, the bullets found at the Merritt's, and the spent shell casings found in Defendant's vehicle were sent to the TBI crime lab in Nashville. The crime lab report stated that the two bullets recovered from the Merritt house were fired from the gun recovered from Mike Maples, which the Defendant had given Maples on the night of the incident.

Deputy Brown interviewed the Defendant on two occasions, but both statements were exculpatory and the State did not introduce them into evidence during its case in chief. The first interview was during the early morning hours of August 8 and the other was two days later. Brown testified that the Defendant was much more alert about the events which he said had occurred during the second interview, but he did not know the Defendant's blood alcohol level and did not give him a field sobriety test to determine his level of intoxication during the first interview in the early morning hours of August 8, 1998.

The Defendant testified and denied that he had ever threatened his wife, Karen, with a gun or had ever assaulted her in front of Edith Merritt. He stated that his wife left him because he got drunk. Defendant told the jury that after he called the Merritt residence on August 7, 1998 and was denied the opportunity to speak with his son, he went outside of the home where he was staying and saw some of his buddies. They offered to let him share some moonshine and he accepted the offer. He later got with two women and went to Gatlinburg to get horse feed. He also got and drank a fifth of whiskey while there and later got a case and a half of beer before returning to Mike Maples' home.

The Defendant testified that going to Mike Maples' home that night was the last thing he remembered. He denied having any memory of the shooting and asserted that he occasionally had "black-outs" from drinking too much. He acknowledged that he had purchased the .380 caliber pistol at a flea market and subsequently pawned it for $55.00. He admitted that on the day of the shooting that he had redeemed the gun from the pawn shop. He also acknowledged that he "went off" when he was denied the right to talk with his son during the phone call to the Merritt household.

## II. Sufficiency of Evidence

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial

evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).  To the contrary, this Court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App.1995).  Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court.  State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987), perm. to appeal denied, (Tenn. 1987).  Nor may this court reweigh or reevaluate the evidence.  Cabbage, 571 S.W.2d at 835.  A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State.  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

The Defendant first contends that the evidence was not sufficient to support his conviction for attempted premeditated first degree murder of Thomas Merritt.  Defendant argues that he lacked the specific intent to commit murder, as well as the premeditation required for first degree murder.

Defendant concedes that the evidence was sufficient to support a conviction for attempted second degree murder, but he contends that the evidence was insufficient to support a conviction for attempted first degree murder because the State failed to establish the required element of premeditation.   Under Tennessee law, first degree murder is "[a] premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1) (1997).  A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result."  Tenn. Code Ann. § 39-11-106(a)(18) (1997).  In addition, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part."  Tenn. Code Ann. § 39-12-101(a)(2) (1997).

 "'[P]remeditation' is an act done after exercise of reflection and judgment."  Tenn. Code Ann. § 39-13-202(d) (1997).  Although premeditation requires that "the intent to kill must have been formed prior to the act itself," "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time."  Id.  The element of premeditation is a question for the jury which may be inferred from the circumstances surrounding the killing.  State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).  Tennessee courts have delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), facts from which motive may be inferred, State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995), and calmness immediately after the killing, Bland, 958 S.W.2d at 660.

Reviewing the evidence in the light most favorable to the State, we can only conclude the proof was legally sufficient to support the Defendant's conviction.   The proof adduced at trial

showed that the Defendant used a deadly weapon to fire upon a house occupied by an unarmed victim, Thomas Merritt. All of the windows were open and all lights were on, permitting the Defendant to see clearly into the house and see Merritt. The day of the shooting, Defendant paid off his pawn shop loan in order to retrieve the .380 semi-automatic caliber gun he used. Maples testified that when the Defendant returned to the Maples residence, Defendant neither appeared intoxicated nor behaved unusual, which the jury could infer as evidence of calm after the shooting.

The Defendant contradicted some facets of the State's proof and offered explanations for conduct that he admitted engaging in. However, it was upon the jury to reconcile any conflicting testimony. The Defendant would have this court reweigh the evidence in his favor. The jury resolved the contradictions against the Defendant, finding him guilty. The jury chose not to believe that the Defendant was drunk and had a blackout, which affected his memory. Instead, the jury decided that the Defendant acted with premeditation and intent to kill Merritt when Defendant shot at Merritt through a well-lit and open bedroom window. There was also evidence that the Defendant had threatened to harm anyone who sided with his wife, during the divorce proceedings. Merritt and his wife were assisting Defendant's wife, and the jury could infer that they were "siding" with her in Defendant's mind. From our review of the record, we find that the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Defendant acted both with intent to kill and with premeditation when he shot Merritt. The Defendant is not entitled to relief on this issue.

Next, the Defendant contends the evidence was insufficient to support the convictions for aggravated assault of Robert Byrd, Karen Loveday, Jimmy Loveday and Edith Merritt. Specifically, Defendant argues that the evidence failed to show that he acted "knowingly." We disagree.

"A person commits assault who intentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2) (1997). The offense of assault rises to aggravated assault if the person "uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(B) (1997). "To establish these charges, the state was required to prove beyond a reasonable doubt that [the defendant] intentionally or knowingly caused the victim[s] to fear imminent bodily injury by his use or display of a deadly weapon." State v. Wilson, 924 S.W.2d 648, 649 (Tenn. 1996). One acts knowingly when, with respect to a result of the person's conduct, "the person is aware that the conduct is reasonably certain to cause the result," Tenn. Code Ann. § 39-11-302 (b), ". . .irrespective of his or her desire that the conduct or result will occur," Id. (Sentencing Commission Comments).

In the light most favorable to the State, there was sufficient evidence whereby a rational trier of fact could have determined beyond a reasonable doubt that the Defendant committed the offense of aggravated assault. The proof established that the Defendant retrieved his gun from the pawn shop on the same day he committed these offenses. Then, Defendant knowingly drove by the Merritt's home, where he knew his wife and children were residing. All of the windows in the Merritt home were open and all lights were on. Next, Defendant used a deadly weapon to fire shots into the Merritt home. The testimony indicated that the bullets fired by the Defendant appeared to follow Karen Loveday as she ran through the house. Edith Merritt testified that, as the bullets came

into the home, she was too shocked to move and afraid for herself and the Scott children. Jimmy Loveday testified that he could not hear the bullets, because he was so afraid. Robert Byrd stated that he was afraid and that bullets were flying on both sides of him and forcing him to grab Jimmy and get on the floor.

A rational trier of fact could have found that the Defendant's action of shooting into an occupied home was for the purpose of causing fear of imminent bodily injury or causing actual serious bodily injury. In fact, each victim testified as to their fear of imminent bodily injury. Again, we emphasize that the resolution of discrepancies in testimony is a matter for the jury to decide. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). The jury had sufficient evidence to convict the Defendant of each count of aggravated assault. Therefore, Defendant is not entitled to relief on this issue.

### III. Admission of Prior Acts

Defendant contends that the trial court erred when it admitted evidence about his prior bad acts because the evidence was inadmissible under Rule 404(b) of the Tennessee Rules of Evidence.

Rule 404(b) provides as follows:

> **Other Crimes, Wrongs, or Acts**. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court find by clear and convincing evidence that the defendant committed the prior bad act. Tenn. R. Evid. 404 (Advisory Commission Comments); State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997); State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985). When a trial court substantially complies with the procedural requirements of the rule, we review the trial court's determination for an abuse of discretion.

DuBose, 953 S.W.2d at 652.  Where a court fails to substantially comply with these requirements, we afford the court's decision no deference.  Id.

The Defendant asserts that trial court failed to follow the procedural mandates of Rule 404(b).  The Defendant contends that the trial court erred by not holding a jury-out hearing to determine the admissibility of testimony concerning prior threats made by the Defendant. However, Defendant simultaneously admits to his failure to request a jury-out hearing and his failure to request that the trial court make specific findings on the record.  Further, Defendant's brief fails to mention his motion in limine, which the trial court heard before the start of trial, addressing the exact testimony Defendant is now attacking on appeal.

In considering Defendant's motion in limine, the trial court ruled that testimony regarding prior threats made by the Defendant against two of the victims, was relevant to the issue of premeditation.  The trial court also found that while the evidence was prejudicial, the prejudice did not outweigh the probative value, because any evidence of prior intent goes to the heart of a charge for attempted first degree premeditated murder.  However, during trial the Defendant again objected to the admission of this evidence and argued that while evidence of threats he made to Karen Loveday and Edith Merritt were relevant to intent, the threats were too remote to the commission of the present offense and were therefore prejudicial.  The trial court overruled the objection, stating that defense counsel could argue the issue of remoteness to the jury in closing argument.  Thus, we conclude that the trial court properly adhered to the mandates of Rule 404(b) and did not abuse its discretion in admitting evidence of prior threats made by the Defendant.

The Defendant contends that the State failed to give him prior written notice of the State's intent to introduce evidence of Defendant's prior bad acts.  The Defendant argues that Tenn. R. Evid. 608(b) requires the State to give the Defendant reasonable written notice of its intent to introduce such evidence of prior misconduct.  The State responds that Rule 608(b) only requires the State to give written notice, when the State intends to use evidence of prior bad acts to impeach a Defendant on cross-examination.  Therefore, the State argues that because it introduced the evidence to show Defendant's intent, and not to impeach him, the State was not required to follow the dictates of Rule 608(b).  We agree.

We also note that at trial, Defendant objected to this evidence because it violated Tenn. R. Evid. 402 and 403.  On appeal, Defendant challenges its admission based upon Rule 608(b).  Since a defendant may not change theories from the trial court to the appellate court, he has waived this argument.  State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993).

We find this evidence was admissible to show Defendant's intent.  During the trial, Karen Loveday testified that in addition to the charged offense, Defendant had assaulted her occasionally. Karen Loveday detailed for the jury two instances when the Defendant pulled a gun on her and threatened to kill her.  Edith Merrit also testified to previous threats the Defendant made to her.

The State contends that the evidence of Defendant's prior bad acts committed against Karen Loveday was relevant to the issue of Defendant's intent when he fired shots into the Merritt home on August 7, 1998. We agree. Although Rule 404(b) prohibits the introduction of evidence of other crimes or bad acts in order to show that the defendant acted in conformity with his or her bad character in committing the charged offense, the rule permits the admission of evidence of prior wrongful conduct if the evidence is relevant to an issue such as identity, motive, <u>intent</u>, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b) (Advisory Commission Comments); <u>State v. Electroplating, Inc.</u>, 990 S.W.2d 211, 223 (Tenn. Crim. App. 1998).

The evidence of Defendant's prior bad acts was relevant to establishing Defendant's intent to harm Karen Loveday and also to harm those supporting her, i.e., the requisite mens rea for attempted first degree premeditated murder of Thomas Merritt. In <u>State v. Smith</u>, 868 S.W.2d 561 (Tenn. 1993), the Tennessee Supreme Court held that evidence of the defendant's prior acts of violence and threats against the victims was admissible under Rule 404(b) in a murder case because the prior bad acts were relevant to showing the defendant's hostility toward the victims, his settled purpose to harm the victims, and his intent and motive for the killings. <u>Id.</u> at 574.

Here, the State had to prove that Defendant intended to kill Thomas Merritt in order to establish all of the required elements of the offense of attempted first degree premeditated murder. As in <u>Smith</u>, the evidence of Defendant's prior wrongful conduct toward Karen Loveday and threats to harm those who aided her was highly probative of his intent and his settled purpose to harm Karen Loveday and those surrounding her. We conclude that danger of unfair prejudice did not outweigh this probative value and thus, the evidence of Defendant's prior bad acts was admissible. Defendant is not entitled to relief on this issue.

## IV. Sentencing

### A. Excessive Sentence

When a defendant challenges the length, range or manner of service of a sentence, the reviewing court must conduct a de novo review on the record with a presumption that the determinations made by the trial court were correct. Tenn. Code Ann. § 40-35-401(d). We condition the presumption of correctness "upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that a sentence is improper is on the appealing party. Tenn. Code Ann. § 40-35-401(d) (sentencing commission comments).

In reviewing the record, this court must consider (a) the evidence at the trial and the sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel, (e) the nature and characteristics of the offenses, and (f) the appellant's potential for rehabilitation. <u>See</u> Tenn. Code Ann. § 40-35-210; <u>see also</u> Tenn. Code Ann. § 40-35-102 & 103. In <u>State v. Jones</u>, 883 S.W.2d 597, 599-600 (Tenn. 1994), our supreme court said that "[t]o facilitate meaningful appellate review . . . the trial court must place on the record its reasons for arriving at

the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence."

Where one or more enhancement factors apply but no mitigating factors exist, the trial court may sentence above the presumptive sentence but still within the range. See Tenn. Code Ann. § 40-35-210(d). Where both enhancement and mitigating factors apply, the trial court must start at the presumptive sentence (i.e., the midpoint for Class A felonies and the minimum sentence for Class B, C, D and E felonies), enhance the sentence within the range as appropriate to the enhancement factors and then reduce the sentence within the range as appropriate to the mitigating factors. Tenn. Code Ann. § 40-35-210(e). The weight afforded an enhancement or mitigating factor is left to the discretion of the trial court if the trial court complies with the purposes and principles of the Tennessee Criminal Sentencing Reform Act of 1989 and the record supports its findings. State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995). Here, the trial court basically complied with the sentencing act, but inappropriately applied three enhancement factors. Therefore, we review the sentences de novo with a presumption of correctness, except as to the length of the sentences for the convictions wherein enhancement factors were erroneously applied.

The jury convicted the Defendant of attempted first degree murder (Class A felony), four counts of aggravated assault (Class C felony) and two counts of reckless endangerment (Class E felony). See Tenn. Code Ann. §§ 39-11-117(a)(2), 39-13-102(d) and 39-13-103(b). As a Range I standard offender convicted of a Class A felony, Appellant's statutory sentencing range was fifteen to twenty-five years. See id., § 40-35-112(a)(1). As a Range I standard offender convicted of Class C and E felonies, Defendant's statutory sentencing range was three to six and one to two years, respectively. See id. at (a)(3) & (4). Tenn. Code Ann. § 40-35-210(c) (1997) sets the presumptive sentence for a Class A felony at the midpoint of the range, if there are no enhancement or mitigating factors. The presumptive sentence for Class C and E felonies is the minimum sentence if there are no enhancement or mitigating factors. Id.

The Defendant complains that the sentences imposed by the trial court were excessive. After a sentencing hearing, the trial court specifically found that there were no mitigating factors applicable to the present case. The Defendant does not challenge that finding. The trial court found seven enhancing factors applicable to some or all of the Defendant's convictions as follows:

> (a) T.C.A. § 40-35-114(1) (defendant has previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range) applicable to all seven convictions;
>
> (b) T.C.A. § 40-35-114(3) (offense involved more than one victim) applicable to all seven convictions;

(c) T.C.A. § 40-35-114(4) (a victim of the offense was particularly vulnerable because of age or physical or mental disability) applicable to the reckless endangerment convictions only;

(d) T.C.A. § 40-35-114(6) (the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great) applicable to attempted first degree murder conviction only;

(e) T.C.A. § 40-35-114(9) (defendant possessed or employed firearm, explosive device, or other deadly weapon during commission of offense) applicable to attempted first degree murder conviction only;

(f) T.C.A. § 40-35-114(10) (defendant had no hesitation about committing crimes when the risk to human life was high) applicable to all seven convictions; and

(g) T.C.A. § 40-35-114(12) (during commission of the felony, defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death or serious bodily injury to a victim or a person other than the intended victim) applicable to attempted first degree murder conviction only.

Based upon the foregoing enhancement factors and relevant sentencing principles, the trial court imposed a sentence of fifty-three (53) years. The Defendant argues that the trial court inappropriately applied the enhancement factors, yet does not specify which factors the court applied inappropriately. Also, Defendant contends the trial court failed to make separate findings as to which factors applied to which convictions. We find that, while the trial court basically adhered to the requirements of the sentence guidelines, it inappropriately applied factors (3), (4), and (10).

### *Factor (3)*

The jury convicted the Defendant separately for the offenses committed against each victim; therefore, the trial court should not have applied factor (3) to any of Defendant's convictions. See State v. Clabo, 905 S.W.2d 197, 206 (Tenn. Crim. App. 1995) (holding that factor (3) was an "improper enhancement factor, since there were separate convictions for each victim").

### *Factor (4)*

The trial court found that enhancement factor (4), that a victim of the offense was particularly vulnerable because of age, was applicable to the reckless endangerment convictions. The trial court also noted that this factor was not entitled to great weight, because the child victims were in no greater danger than the adult victims in this case. However, we conclude that because the children were in no greater danger, this factor was not applicable.

*Factor (10)*

The trial court incorrectly applied enhancing factor (10) to each of Defendant's convictions. First, this Court has previously held that factor (10) generally cannot be applied to a sentence for an attempted first degree murder offense because a high risk to human life is inherent in the offense. See State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). Second, the victims were the only persons subject to injury during Defendant's commission of these offenses. See State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995) (holding factor (10) is applicable where the defendant creates a high risk to the life of a person other than the victim(s)). Thus, factor (10) was not applicable to any of Defendant's conviction.

With respect to calculating the Defendant's sentence, we find that the four enhancement factors (Tenn. Code Ann. §§ 40-35-114 (1), (6), (9) and (12)) applied to Defendant's attempted first degree murder conviction justify the sentence of twenty-five years. However, we have found that only one enhancement factor (Tenn. Code Ann. § 40-35-114 (1)) applied to Defendant's four (4) aggravated assault convictions and his two (2) reckless endangerment convictions. Therefore, we reduce Defendant's aggravated assault sentences to four (4) years each and the reckless endangerment sentences to eighteen (18) months each.

### B. Consecutive Sentences

Defendant next challenges the trial court's imposition of consecutive sentences. Tennessee Code Annotated section 40-35-115 pertains to consecutive sentencing. The trial court has the discretion to order consecutive sentencing if it finds that one or more of the required statutory criteria exist. State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). The trial court may order consecutive sentencing if the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4) (1997). However, when a trial court uses this factor, it must also decide whether consecutive sentences (1) reasonably relate to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

The record indicates that in determining whether to impose consecutive sentencing, the trial court found that the Defendant was a dangerous offender. We agree with the determination that Defendant is a dangerous offender with little regard for human life and no hesitation about committing a crime in which the risk to human life is high. Defendant fired multiple gunshots into a home clearly occupied by several people, including his wife and children. Further, there is circumstantial evidence that he emptied one clip, reloaded and fired from a second clip.

The trial court, through its findings, further satisfied the additional Wilkerson requirements. At the sentencing hearing, the trial court stated the following:

**COURT**: ". . . the Court cannot just take the language and give the Court's own interpretation, that he is a dangerous offender because of this conduct. The Court has to go further and consider #1, that the defendant's behavior indicated little or no regard for human life and he did not hesitate about committing a crime in which the risk to human life was high. That's clearly established by this proof.
The circumstances surrounding the commission of the offense were aggravated. That, too, is clearly established by the proof. The fact that there were so many people there right in front of him and blindly opening fire where children and others were present.

That confinement for an extended period of time is necessary to protect society. That, too, is clear in this record, that Mr. Loveday posed a danger. There was testimony in the trial that inferred threats were made. It's clear that he [Defendant] was very, very, very mad at his wife and those that would help her, coupled with previous threats. It is necessary.

And lastly, that the aggregate length of the sentences reasonably relates to the offenses for which he [the Defendant] stands convicted. The court must apply those factors as well."

". . .In applying the rationale of the law, applying it to the conduct, applying it to the facts and circumstances and carrying out the Court's responsibility , the Court feels that consecutive sentences for each of these offenses for which Mr. Loveday stands convicted is the proper judgment. . ."

Based upon the trial court's findings, consecutive sentencing reasonably relates to the severity of the offenses. Indeed, the jury convicted Defendant of seven felony offenses related to the lives he put at great risk. Also, consecutive sentences are required here to protect the public from further criminal conduct by Defendant. Clearly, Defendant's violent and intentional conduct toward Karen Loveday and the other victims indicates that he will not hesitate to threaten or actually use violence against others. Further, Defendant's ability to carry out previous threats in such a violent manner indicates that he poses a continuing threat to the public. Finally, consecutive sentencing in this case is congruent with the general principles of sentencing. We agree with the trial court's ordering of consecutive sentencing. With the reduction the in length of six of his sentences, Defendant's effective sentence is reduced from fifty-three (53) years to forty-four (44) years.

### C. Victim Impact Letters

Defendant contends that the trial court erroneously permitted victim impact letters from individuals who did not testify at the sentencing hearing to be placed into the record. Victim impact evidence is not per se improper under statutory or constitutional law. State v. Nesbit, 978 S.W.2d

872, 889 (Tenn. 1998); State v. Burns, 979 S.W.2d 276, 281-82 (Tenn. 1998). Tenn. Code Ann. § 40-38-205 provides as follows:

> Prior to imposition of sentence in a felony case, the department of correction shall prepare a written victim impact statement as part of the presentence report on the defendant. The statement shall include applicable information obtained during consultation with the victim or the victim representative. . . If there are multiple victims and preparation of individual victim impact statements is not feasible, the department may submit one (1) or more representative statements.

We conclude that the trial court properly admitted the victim impact letters into the presentence report. In any event, Defendant has waived this issue. See Tenn. R. App. P. 36(a). At the sentencing hearing, Defendant failed to object to the trial court's consideration of the victim impact letters.

### V. Conclusion

For the reasons stated above, we modify Defendant's sentence for the four (4) aggravated assault convictions to four (4) years each. In addition, we modify Defendant's sentence for the two (2) reckless endangerment convictions to eighteen (18) months each for an effected sentence of forty-four (44) years. In all other respects, the judgment of the trial court is affirmed as modified.

_____
THOMAS T. WOODALL, JUDGE